1815.

Baltimore Insur-ance Company vs M'Fadon.

## THE BALTIMORE INSURANCE COMPANY vs. M'FADON.

DECEMBER.

APPEAL from *Baltimore* County Court. This was an action of covenant on a policy of insurance dated the 11th of March 1799, brought in the name of *John M'Fadon*, as surviving partner of *R. Lawson*, for the use of *Dorsey* and *Hollins*. The defendants, (now appellants,) pleaded *non infregit conventionem*, and bankruptcy of the plaintiff. Is-sue was joined to the first plea, and a replication to the second plea, that the policy was assigned, &c. Rejoinder, that there was no assignment. There was an agreement that all errors in the pleadings should be released.

1. The plaintiff, (now appellee,) at the trial, read in evidence the policy of insurance in the declaration menti-oned, under the common seal of the defendants; and also gave in evidence, that on or about the 1st of March 1799, the brig *Betsey*, in the policy mentioned, sailed from *Bal-timore* to *Barracoa*, in the Island of *Cuba*, on the voyage

A policy of in-surance dated in 1799, was effected on the cargo of a vessel bound from B, in the U S. to A, in the Island of *Cuba*, which vessel was captur d, and the cargo lost to the insured. It was proved that the vessel cleared out from B to C, on the continent of *South America*, and proceeded on her voyage to C and not to A, and when captured had a re-gular clearance for C, together with a bill of lading, in-voice and manifest of the cargo, and affidavit to prove of annexed to the property there-invoice, with a let-ter of instruction from the insured to the captain of the vessel, relative to the manifest of the cargo, passports voyage and sea let-

ter; in all of which the voyage was described as a voyage from B to C. The evidence of the captain was, that he sailed from B to A, and with positive instructions from his owners to proceed to A, and he was going direct thereto when he was captured. Evidence was also offered by the assured, that at the time of making the policy, the fact that the vessel had cleared out for C, and had on board the said documents, was known to the assurers—*Held*, that if the vessel did in fact proceed on a voyage from B to A, at the time mentioned, and if the fact, that she had cleared out for C, and had on board the said documents, describing her voyage as a voyage to C, was known to the assurers at the time of making the policy, then the clearance, and the documents, could not in law affect the assured's right to recover.

If the intent and object of the voyage, and the instructions to the master of the vessel, were to pro-ceed with the cargo to A, and there leave the vessel to go to J, a port within the territory of the French republic, and under the known and acknowledged authority of France, and at J to sell, barter or exchange, or otherwise dispose of, the cargo, or a part thereof, to or with some person at J, or with the proceeds of the cargo to purchase there the whole or a part of a return cargo for the owners, with in-tent to convey and ship the same on board the said vessel as a return cargo, or part of a return cargo, that then the assured cannot recover. Per *Nicholson*, Ch. J. in the county court.

A promissory note drawn by P, in favour of D, may be set off in an action on an open policy of in-surance brought by P against D.

Where a vessel and cargo, after being captured, were libelled as prize and for salvage in the court of vice admiralty, and part of the cargo was sold by virtue of an interlocutory decree of that court for less than the value, according to the invoice and actual price, and the proceeds of sale paid to the as-sured; and the vessel and cargo were acquitted and ordered to be restored by a final decree, and the vessel and residue of the cargo given up to the assured, who sold the residue of the cargo for less than the value, according to the invoice, and received the same—*Held*, that the assured was entitled to reco-ver, as for a partial loss, for the difference between the sum produced by the sale of that part of the cargo which was sold by the order of the court of vice admiralty, and the actual value thereof at the port of B, where the insurance was effected, but that the assured was not entitled to recover for the diff erence between the sum produced by the sale of that part of the cargo which was sold by the assur-ed himself, and the actual value thereof at the port of B

1815.

Baltimore Insurance Company
vs
M'Fadon

insured in and by the policy, having on board a cargo of lawful goods to the value of $30,000, and upwards, the property of the plaintiff and *R. Lawson*, and *R. Caton* and *J. F. Kennedy*, all then citizens of the *United States;* that the said brig, with said goods on board, then proceeded on the said voyage, and while in the regular prosecution thereof, on the high seas, afterwards, to wit, on or about the 20th of March aforesaid, was captured and taken, together with the said goods, by a *British* ship of war, whereby the said goods were totally lost to the plaintiff, and *R. Lawson, J. F. Kennedy* and *R. Caton.* The defendants then gave in evidence, that the brig *Betsey*, on the said 1st of March aforesaid, cleared out from the port of *Baltimore* for *Carthagena*, on the continent of *South America*, and actually proceeded, on or about that day, on a voyage to *Carthagena*, and not to any port in the Island of *Cuba;* and that the said brig then and there took on board, and at the time of the capture had on board, a regular clearance for *Carthagena*, together with a bill of lading, invoice and manifest, of the said cargo, and affidavit to prove the property thereof annexed to the said invoice, a letter of instruction from the plaintiff to the captain of the said brig relative to the said manifest of the cargo, passport voyage, and a sea letter therefor; in all of which several papers and documents the voyage is described as and declared to be a voyage from *Baltimore* to *Carthagena.* And the defendants read in evidence the said clearance, bill of lading, invoice, affidavit, letter of instructions, passport and sea letter. The defendants further gave in evidence, that at the time of making the said policy, it was, and ever since hath been, the usual and constant practice of the defendants, and of some other insurance companies in the city of *Baltimore*, when applied to for insurance on vessels cleared out for one port, but actually bound to another, to require from the applicants a written communication of the fact of the clearance or ostensible voyage in the order of insurance, or otherwise; and *Alexander M'Kim*, the former president of the *Baltimore Insurance Company*, who among others proved the above usage, being asked by the plaintiff's counsel whether the *Baltimore Insurance Company* would have dispensed with the information being in writing if they had been pressed so to do by the person proposed to be insured, replied, that no case

had occurred to his knowledge, but if such application had been made, strong reasons must have been assigned to have induced the *Baltimore Insurance Company* to acquiesce in the request; all of which is mere matter of opinion on the part of the witness as to what might have been done by the directions of the *Baltimore Insurance Company* upon such application. The plaintiff then read in evidence, by consent, among other evidence of that fact, the following deposition of *William Furlong*, master of the brig *Betsey*, with a paper thereto annexed, and therein referred to, purporting and admitted to be the rough minutes or draft of a letter of instructions from the plaintiff to *Furlong*, of and concerning the said voyage. The deposition of Captain *William Furlong*, taken the 4th of October 1811, stated—"That he sailed out of the port of *Baltimore* some time in March 1799, on board of the brig *Betsey*, as master thereof, bound to *Barracoa*, within two leagues of which he was captured by a *French* privateer, and carried into a port two leagues to the windward of *Barracoa*; was there cut out by a *British* frigate, and carried to *Jamaica*. That he sailed with positive instructions from his owners to proceed to *Barracoa*, and that he was going direct thereto, without any deviation, when he was captured. That he left his letter of instructions, with other papers, in *Jamaica*, and that the paper hereto annexed, marked A, contains the substance of that letter. That his letter of instructions from his owners only spoke of *Barracoa* as his port of destination. He does not recollect whether he had two letters of instructions or not. That his instructions to proceed to *Barracoa* were in writing. That he delivered up to the commander of the *British* frigate the whole of his papers, and that no papers were concealed. That if he had been bound to *Carthagena* he would have been out of the course of his voyage when he was captured by the *French* privateer." *Exhibit A.* "Herewith you," &c. &c. "Should Mr. *Kennedy* not be at *B.* you will call on Mr. *John Richeau*, and in his absence on *P. Casamajor*, and in his absence to Mr. *Boreau*. You will let the brig remain there; get over to *Jeremie*, explain the business of your voyage to *John Ducarneau*, who will suggest the wisest plan for you to move in. Mr. *Casamajor* is our friend, and an upright, intelligent man; he is the second person you will depend on, and can be of more use to you

than any other in the island. The business of the small vessels are only known to Mr. *Ducarneau* and Mr. *Kennedy*, you will of course let them be disposed of as *Ducarneau* directs. Dispatch is every thing. Herewith you have a letter to Mr. *Kennedy*. You will open and read it, and you will govern yourself, in case of his absence, by our directions to him. Should the intercourse be opened you shall receive the earliest information." The plaintiff also read in evidence the following letter from *Alexander M'Kim* to the plaintiff, dated the 18th of January 1813, *M'Kim* being at that time the president of the *Baltimore Insurance Company*, to wit: "The abandonment of the cargo of the brig *Betsey*, Capt. *Furlong*, offered on the 11th inst. to the *Baltimore Insurance Company*, is rejected. The company are bound by their policy for their proportion of all expenses incurred or to be incurred in the defence of the property, which proportion of expenses they will always be ready to pay on the production of proper vouchers thereof, and any other loss or injury arising under the policy, as soon as the same can be adjusted." The plaintiff also gave in evidence, that at the time of making the said policy, the fact that the brig had cleared out for *Carthagena*, and had on board the documents describing her voyage as a voyage from *Baltimore* to *Carthagena*, was known to the defendants. The plaintiff then prayed the opinion of the court, and its direction to the jury, that if they believed the said vessel did in fact proceed on a voyage from *Baltimore* to *Barracoa* at the time mentioned, and if the fact that she had cleared out for *Carthagena*, and had on board the said documents describing her voyage as a voyage to *Carthagena*, was known to the defendants at the time of making the said policy, then the said clearance, and the documents last aforesaid, cannot in law affect the plaintiff's right to recover. Which opinion and direction the Court [*Nicholson*, Ch. J.] accordingly gave. The defendants excepted.

2. The plaintiff having read in evidence the aforesaid deposition of *William Furlong*, with the paper thereto annexed, and having so read the same to prove that the real voyage of the brig *Betsey* was to *Barracoa*, in the Island of *Cuba*, the defendants read and relied on the said letter and paper to prove, that the master of the brig *Betsey* was in-

1815.

Baltimore Insurance Company
vs
M'Fadon

structed by the owners of the vessel and cargo, to proceed with the said cargo to *Barracoa*, in the Island of *Cuba*, and there to leave the vessel to go to the port of *Jeremie*, admitted to be a port or place in the Island of *St. Domingo*, in the *West Indies*, near to the port of *Barracoa*, and admitted to have been then, and long before and after, a port or place within the territory of the *French* Republic, and under the known and acknowledged authority of *France*; and at the port of *Jeremie* to sell, barter or exchange, or otherwise dispose of in the way of commerce and traffic, the whole or some part of the said cargo, to or with some person or persons resident at the port of *Jeremie*, or resident at some other port or place within the jurisdiction or under the authority of the *French* Republic; or with the proceeds of the said cargo, or by other means, to purchase from such person or persons, so resident, the whole or some part of a return cargo for the said owners, with intent to convey and ship the same on board of the said brig as a return cargo, or part of a return cargo. And thereupon prayed the opinion of the court, and their direction to the jury, that if the jury should believe the said facts from the said evidence, then the policy of insurance was void. But the plaintiff objected to the said direction, and to the competency of the said evidence for the purpose aforesaid. And the court were of opinion, and so directed the jury, that if they believed the intent and object of the voyage, and the instructions to the master, to be as above stated, that then the plaintiff cannot recover in this action; for he cannot call upon a court of this country to aid him in recovering a compensation for not having succeeded in an attempt to violate the laws of the country. And the court were further of opinion, that competent and sufficient matter had been disclosed by this letter, when connected with the other evidence in the case, to leave this question to the decision of the jury. The plaintiff excepted.

3. The defendants then offered in evidence the following promissory notes given by *John M'Fadon, & Co.* and by *Richard Caton* and *John M'Fadon, & Co.* to the defendants, in discount or bar of the plaintiff's claim, to wit: One note dated the 11th March 1799, drawn by *John M'Fadon, & Co.* and *Richard Caton*, for $3402 75, payable to the defendants, or order, six months after date. Another dated 22d August 1801, drawn by *John M'Fa-*

*don*, & *Co.* for $3833 34, and payable as aforesaid nine months after date.   Another dated 14th January 1802, for $544 30, drawn by *Richard Caton* and *John M'Fadon. & Co.* and payable as aforesaid three months after date. Another dated 19th January 1802, drawn by the last mentioned persons, for $602 50, and payable as aforesaid 15 months after date.   Another dated 23d September 1801, drawn as aforesaid, for $1752 75, and payable as aforesaid, fifteen months after date; and another dated July 8, 1799, for $3882 82, and drawn and payable as aforesaid, three months after date.   The defendants then proved that the said notes were respectively signed by *John M'Fadon*, & *Co.* and *Richard Caton*; and that *Richard Lawson*, who was the partner of *John M'Fadon*, trading under the firm of *John M'Fadon. & Co.* died on the 1st of November 1803; and that *John M'Fadon*, mentioned in the said notes, and the plaintiff, are one and the same person; and that the plaintiff on the 1st of December 1803, having previously committed an act of bankruptcy on the 29th of November 1803, and being then and there a person residing in *Baltimore*, and using the trade of merchandize, by buying and selling in gross, was duly declared a bankrupt within the true intent and meaning of the act of Congress of the *United States*, entitled "An act to establish an uniform system of bankruptcy throughout the *United States*;" and that *Thomas Caldwell* and *August A. Swartze*, were duly appointed assignees of the estate and effects of the said bankrupt, and that the estate and effects of the said bankrupt were and became duly and according to law vested in the said assignees; and that the plaintiff, having regularly complied with the provisions of the said act of congress, obtained his certificate of discharge in pursuance of said act.   The plaintiff then gave in evidence, that on the 24th of October 1803, he, the plaintiff, and *Richard Lawson*, by the name of *John M'Fadon*, & *Co.* at *Baltimore*, did assign, transfer and deliver, the policy aforesaid, to a certain *Robert Oliver*, for a valuable consideration; and that on the same day and year the said *Robert Oliver*, for a valuable consideration, did assign, transfer and deliver, the said policy, to a certain *John F. Kennedy*; and that afterwards, on the 25th of October aforesaid, the said *John F. Kennedy*. at *Baltimore*, did assign, transfer and deliver, the said policy, for a valuable consideration,

to a certain *Joshua Dorsey* and *John Hollins*, who now hold the same, and for whose use this action is brought. The plaintiff then objected to the said notes being admitted in discount and bar as offered by the defendants And the court was of opinion, that in as much as this was an open policy, and the claim of the plaintiff was for general, uncertain, and unliquidated damages, that the said promissory notes could not be admitted in bar or discount of the plaintiff's action, and therefore rejected them. The defendants excepted.

4. The plaintiff then gave in evidence, that the brig *Betsey* and cargo, after being captured as aforesaid, was carried by the captors into the Island of *Jamaica*, and were there by them libelled as prize, and for salvage, in the vice admiralty court of the said island, and duly claimed on the part of the owners; that a part of the cargo, consisting of flour in barrels, fish in casks and boxes, oil in flasks, and wine in bottles, and of the value, according to the invoice and actual price, of $5000, were sold in the Island of *Jamaica*, and produced the sum of $4000, which sum the plaintiff received; that the said sale took place under and by virtue of an interlocutory decree of the said court of vice admiralty, which decree is contained in the record of the proceedings of the vice admiralty court of *Jamaica*, which he produced in evidence. That after the said interlocutory decree, the said vice admiralty court acquitted the said vessel and cargo, and ordered the same to be restored by a final decree, which said final decree was also offered in evidence. He further proved by the record of said proceedings, that an appeal was duly interposed from the said decree by the libellants, upon which the said vessel and cargo were ordered to be given up to the plaintiff, on his entering into a stipulation to fulfil the final decree on the appeal, which he accordingly did; and thereupon the vessel, and the residue of the cargo, were, pursuant to the last mentioned decree of the vice admiralty court, delivered up to the plaintiff, who thereupon and of his own accord sold a further part of the cargo, consisting of flour in barrels, fish in casks and boxes, and wine in bottles, to the value of $10,000, according to the original invoice; which said last mentioned part of the cargo produced at the said sales the sum of $8000. That the said two

1815.

Baltimore Insur-
ance Company
vs
M'Fadon

sums of $8000 and $4000, were then and there received by the plaintiff, and applied to his own use. The plaintiff then prayed the court to direct the jury, that if they believed the said facts, and if the plaintiff, under the sundry opinions of the court, is entitled in their opinion to recover, then he is entitled to recover as for a partial loss on and for the said two parts of the cargo sold as aforesaid, and each of them, by reason and on account of the said deficiency in the sums produced by the sales respectively. And the court directed the jury, that the plaintiff was entitled to recover as for a partial loss for the difference between the sum produced by the sale of that part of the cargo which was sold by the order of the court of vice admiralty, and the actual value thereof at the port of *Baltimore;* but that the plaintiff was not entitled to recover for the difference between the sum produced by the sale of that part of the cargo which was sold by the plaintiff himself, or by his agents, and the actual value thereof at the port of *Baltimore.* The defendants excepted to the first direction of the court, and the plaintiff to the second. The verdict and judgment being for the plaintiff, the defendants appealed to this court.

The cause was argued before CHASE, Ch. J. and BU-CHANAN, EARLE, JOHNSON, and MARTIN, J.

*Pinkney,* for the Appellants, contended—1. That the action was not properly brought; that it should have been in the names of the persons interested; and that the release of errors in the *pleadings,* agreed to by the counsel in the cause, did not operate to cure the error. He insisted that this agreement did not apply to the writ. That in the construction of instruments, where technical terms are used, the law gives the meaning.

2. That the plaintiff, being a bankrupt, the action could not be sustained in his name. The assignment of the policy was merely by indorsation; and it is questionable whether a policy of assurance is that kind of instrument, being under seal, which can be transferred by indorsation. In *Pennsylvania,* it has been decided that it cannot; though in *England* the doctrine is otherwise. The assignment should have equal solemnity as the original instrument. If the transfer is not legal, then the interest under the policy is in the assignees, under the act of bankruptcy, and the

action is brought wrong; and if it is legal, and the policy was transferred by simple endorsement, then the suit should have been brought in the names of the assignees under the transfer.

3. That a liquidated claim due from the plaintiff to the defendants, may be set off against an unliquidated demand of the plaintiff against the defendants. He referred to the act of 1785, *ch.* 45, *s.* 7. *Rousset vs. The Insurance Company of North America*, 1 *Binny's Rep.* 429, *(and note.)*

*Harper* and *Winder*, for the Appellee, contended—1. That there was no defect in the writ, the policy being in the names of *John M'Fadon, & Co.* and all and every other person, &c. so that any person interested therein may bring a suit on it. 2 *Marsh.* 683. The pleadings do not show that any persons but *John M'Fadon, & Co.* were interested. But if there is error in the writ, the release of errors in the pleadings, by a liberal construction of the agreement, will remedy it; and if the declaration states that others were interested, this is expressly released by the agreement—the declaration being part of the pleadings.

2. The question with respect to the assignment of the policy is not open. The plaintiff was merely a trustee, after he had assigned his interest, for the benefit of the persons to whom he had made the equitable assignment, which was not affected by his bankruptcy; and the assignees under the bankruptcy had nothing to do with the trusts of the bankrupt. Whether or not the assignment was made before the bankruptcy, was an issue which the jury found in favour of the assignment. The universal practice is to assign a policy of insurance by simple endorsement, and therefore no particular form is necessary.

3. The set-off may be resisted on three grounds—1st. The act of 1785 does not permit a defendant to offer a set-off in an action for an unliquidated claim. No action is susceptible of a set-off unless where the demand is for a certain sum. 2d. The notes offered to be set off were rejected generally, and if there was any good reason for rejecting them, the judgment of the court below was right, although the reasons for their judgment may not be so. The notes offered as a set-off were offered *ore tenus*, the plaintiff therefore could not plead the act of limitations to the notes, but must set it up *ore tenus*. The objection

1815.

Baltimore Insur-
ance Company
vs
M'Fadon

against the set-off was general, and one may be now urged which had not been in the court below. 3d. The equitable assignees were not liable to any claim against the assignor without notice, and there was no proof of notice. Upon either of these grounds the judgment of the court below is correct.

*Pinkney*, in reply. It would not be proper to set off an unliquidated demand, because there would be two distinct issues to try. The defendant's demand must be liquidated, but the plaintiff's need not. The notice of the assignment of the policy should be given by the assignees to the insurers, and not having done so, if the assignment was legal, there is nothing to prevent the set-off for antecedent claims against the assignor. If it were otherwise, great injustice would be done. It is admitted that limitations might have been set up at the trial in bar of the notes, if standing more than three years; but it must be pleaded, or it must appear in the bill of exceptions, that the notes were rejected on that ground; and it not appearing that the rejection of the set-off was because they were barred by limitations, this court cannot notice that the rejection was on any such ground. It has ever been holden that the statute of limitations cannot be relied on, unless it is expressly shown that it is relied on. He cited *Stoddert v Dunlop*, 2 *Harr. Ent.* 490 *Stone v Rafter*, 1 *Harr. & Johns.* 864; and *Clarke v Magruder*, 2 *Harr. & Johns.* 77.

JOHNSON, J. This is an action brought on an open policy of insurance, in which the plaintiff must not only show that the event insured against has taken place, but also establish the value of the goods insured. Had the suit been on a valued policy, proof to the first point would only have been necessary—the parties themselves having agreed on the amount to be recovered, in the event of a recovery, when the policy was entered into.

To free themselves from the plaintiff's claim, the underwriters produced, by way of discount or set-off, several notes, joint and several, executed by the insured to them. These notes were, by the decision of the court below, rejected, because the policy being *open*, the extent of the plaintiff's claim was *uncertain*—dependant on the real value of the goods insured.

In all instances of controverted claims on policies of insurance, the demand, in one sense, must be uncertain; for it being a question whether the underwriters are responsible, a decision on that subject must be first obtained, before the extent of the claim presents itself—in the valued policy, that has been agreed on—in the open policy it must be established by proof. It is then on account of the uncertainty as to the extent of the claim, and not the uncertainty of the claim itself, that the notes were rejected; for as the decision appears to be founded on the policy being open, had it been valued, a contrary decision would have been pronounced.

1815.

Baltimore Insurance Company
vs
M'Fadon

This is the first time, within my recollection, where this question has presented itself for the decision of this court, and it must depend on the true construction of the act of 1785, *ch.* 46, in virtue of which the discounts were attempted to be made.

It would seem but just that mutual claims should be set off, one against the other; that neither should be compelled to pay, when the sum so paid must be refunded on a judgment rendered on the adverse claim. Reasonable as this is, the common law, (if I may so term it,) excluded all such payments, and the parties were left to their mutual remedies at law by distinct suits, or one of them must resort to a court of equity to have his claim set off or discounted from his adversary's judgment.

In this situation were claims of this description left until the time of *Geo.* II, in the second year of whose reign a law passed permitting "mutual debts between the plaintiff and defendant" to be set off, one against the other. This statute contains no other description as to the nature of the debts, except that they are "mutual"—whether of equal or superior nature as to their origin—whether the one was on a specialty, and the other on a simple contract, made no difference, except the word "mutual" must restrain them to debts of the same nature. The courts having so long rejected defences of this description, after the passage of this remedial statute, they restrained its operation as far as practicable, and would permit no debts to be discounted, except of the same grade. The legislature of *Great Britain* again interposed, and in 8 *Geo.* II, passed another statute permitting discounts, "notwithstanding they were of different natures."

These two statutes having passed before the separation of this country from *Great Britain*, did or did not form a part of the law of *Maryland* at the time of the revolution; if they did, who can believe the legislature of this state, in the year 1785, would solemnly have passed an act, which was to have no effect? If they did not, as the construction on those statutes was well known, if no more was intended than was embraced by them, can it be conceived that an intelligent legislature would not have adopted the language of those statutes which were known fully to comprehend those objects? But the act of 1785 varies materially from those statutes, and therefore the decision on them, by any rational rule of construction, cannot be solely applied to it.

It has been remarked, that claims, under policies of insurance, as well as claims of every other description, must be uncertain in one sense; that is, whether any claim to any amount exists; if it doth exist, then, and not before, the extent of the claim presents itself. Debts of every description, whether they arise on specialties or simple contracts, are in the same predicament—the instrument must first be proved, or the contract must be proved, before you can examine into the amount of the claim. Nor does it necessarily follow that the instrument, under which the claim is founded, when proved, must disclose on its face the extent of the claim, or that, when resting on simple contract, the contract, when proved, must produce the same result.

Even under the *English* statutes the contract proved is only introductory to the extent of the demand which may be ascertained by evidence not appearing in the contract, and when ascertained, either by confession, or on demurrer to a plea, setting forth such a claim, or by proof, if contested, and in either case is a claim sufficiently certain and ascertained to be deducted from the plaintiff's demand.

In *Fletcher vs. Dycke*, 2 *T. R.* 32, the claim arose from not having done certain work within a certain given time, under a contract, stipulating that for each week after the expiration of the stipulated time, a specific sum was to be paid; the time that had expired was necessary to be averred, and if not admitted, must of course have been proved.

In the case of a simple contract, whether for work and labour done, on a *quantum meruit*, or goods sold on a *quan-*

1815.

Baltimore Insurance Company vs M'Fadon

*tum valebant,* the contracts under which the work was done, or the goods sold, must be proved or inferred, and when proved or inferred, yet the extent of the claim rests on other evidence—the value of the work, or the worth of the goods. In the case of an open policy, that being proved, the loss warranted against being ascertained, what remains more to be done than on the *quantum valebant,* that is, to ascertain the value of the goods—in the one instance sold—in the other insured; and, so far as that ascertainment, surely in the one instance, as well as in the other, the extent of the claim is unliquidated. And yet who can doubt but that a set off on the *quantum meruit* or *valebant,* would be allowed.

No reason can be urged why a person who has an uncertain claim should be permitted to recover from him who had a certain demand. If any difference ought to be made it should be in favour of that which is certain; for a great length of time might be necessary to ascertain the one, and perhaps it might totally fail for the want of proof, and therefore it might be unreasonable to compel the certain creditor to await the termination of the uncertain demand on him. But if he thinks proper to retain his certain demand to meet that which is uncertain, why should he be prevented? He ought not to be prevented, unless the act positively directs it. Recur to that act, and not a word is to be found on the subject of liquidated or unliquidated claims, or debts of any description; its language is general, "that in case any suit shall be brought on any judgment, or on any bond, or other writing sealed by the party, and the defendant shall have any demand or claim against the plaintiff, upon judgment, bond, or other instrument under seal, or upon note, agreement, assumpsit, or account proved, as by this act is allowed the defendant, or otherwise according to law, shall be at liberty to file his account in bar, or plead discount to the plaintiff's claim, and judgment shall be given for the plaintiff for the sum only which remains due after just discount made; provided the sum which shall remain due, after such discount, be sufficient to support a judgment in the court where the cause may be tried, according to its established jurisdiction; *and in all cases of suits upon simple contracts, the defendant may file an account in bar, or plead discount of any claim he may have against the plaintiff,* proved as aforesaid, or otherwise

1815.

Baltimore Insurance Company
vs
McFadon

proved according to law, *which may be of an equal or superior nature to the plaintiff's claim,* and judgment shall be given as aforesaid."

As the courts have adjudged that their jurisdiction remained, without regard to the sum found due, on all contracts not expressly found to be within the act limiting the jurisdiction, the proviso in the act of 1785, *ch.* 46, s. 7, it is said, must restrain the general expression in the enacting part of that act, and confine it to such contracts, the jurisdiction over which depended on the amount of the claim. In construing every instrument of writing the whole must be taken together, and no interpretation, if possible to be avoided, should be given, that tends to render any of the provisions nugatory, much less the whole of them; and we have seen, that restraining the words of the act of 1785, so as to exclude the discounts in question, would make the general and comprehensive expression of that act useless, by limiting the right to discount to those cases that had been provided for by the statutes of *George,* or by the act of this state passed in 1729, *ch.* 20, s. 5. If, therefore, we were driven to the necessity of excluding all effect to any part of the act of 1785, the proviso must yield to the enacting part, and not it to the proviso. But in giving the opinion which has been pronounced, no such dilemma presents itself. For if the jurisdiction of the court on *some* contracts depends on the sum found due, and on others the authority remains to adjudicate without regard to the sum, then it follows, that on all such contracts, where the jurisdiction rested on the sum due after the discounts made, if those discounts reduced the claim below the jurisdiction, the judgment must be for the defendant; but where the contract, on which the suit was brought, was of a different description, there the plaintiff must have judgment for the sum due, without regard to the amount. And whether the contract sued on was of the one description or the other, must be determined by the court, as it has to do in all cases where the sum found due by a jury, or otherwise, is under the ordinary limits.

By a liberal and extensive construction of the act, the object and policy of the law is advanced by enlarging the description of those claims against which discounts were to be admissible; and if it is not just to permit one man to recover a sum of money from another, to whom he is

1815.

Baltimore Insur
ance Company
vs
M'Fadon

liable for a like sum, so is justice promoted by extending the power of discount. For if the right to discount does not exist, then it is in the power of a person who has a claim, to transfer that claim, and enable the transferree to recover the sum due, notwithstanding he, from whom the claim was obtained, never could have forced a payment of the money; for in his hands, either at law or in equity, it must have been subject to all demands on contract against him, whether those demands arose on contracts even between the same, or other persons. But if the defendant is not permitted at law to discount, neither could he, it is apprehended, have redress in equity, where the claim had been transferred to a third person, who had no notice at the time he received the assignment. A more striking instance of the injustice of restraining discounts cannot be conceived, than the case now before the court presents. The underwriters having fixed, ascertained, and just claims on the assured, must notwithstanding be compelled to pay the money to his assignees, when the assignor himself could never have coerced the payment; for against him, most assuredly, at equity, relief might have been obtained, and the one demand set off against the other. By permitting the discounts at law his assignees will, as they ought, stand in his place, and be liable to the same objections against the payment of the money that might have been made against their assignor.

The Court concurred in the opinions of the County Court in the *first* and *fourth* bills of exceptions, and dissented from that in the *third* bill of exceptions. The *second* bill of exceptions having been taken by the plaintiff below, did not come under the consideration of the court.

Buchanan, J. dissented from the opinion given by this court on the *third* bill of exceptions.

JUDGMENT REVERSED, AND PROCEDENDO AWARDED.